ARKANSAS DIAGNOSTIC CENTER, P.A. *v.*
Dr. Abdalla TAHIRI, M.D.

06-667 257 S.W.3d 884

Supreme Court of Arkansas
Opinion delivered May 31, 2007

*Friday, Eldredge & Clark, LLP*, by: *Jeffrey H. Moore*, for appellant.

*Ball & Stuart, PLLC*, by: *Jason A. Stuart*, for appellee.

PAUL DANIELSON, Justice. Appellant Arkansas Diagnostic Center, P.A. (ADC), appeals from the circuit court's order denying its motion to compel arbitration of its employment agreement with appellee Dr. Abdalla Tahiri.[1] ADC's sole point on appeal is that the circuit court erred in denying the motion, as it contends that the Federal Arbitration Act (FAA) applies to the agreement and requires arbitration of all claims. We affirm the circuit court's denial of the motion to compel arbitration.

The facts are these. On May 1, 2004, Dr. Tahiri entered into an employment agreement with ADC, an Arkansas medical cor-

---

[1] This case was certified to this court on December 18, 2006, involving an issue of first impression and federal constitutional interpretation. *See* Ark. Sup. Ct. R. 1-2(b)(1), (3) (2006).

poration. Section 12 of the agreement specifically provided that "[a]ny controversy or claim arising out of, or relating to, this Agreement, or the breach thereof, shall be settled by arbitration in the City of Little Rock in accordance with the rules then existing of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof."

On February 21, 2006, Dr. Tahiri filed a complaint against ADC in the circuit court. The complaint alleged that during the term of his contract with ADC, the working conditions at ADC became so intolerable that it jeopardized his ability to continue professionally practicing his medical skills. Specifically, he alleged that "[o]n a frequent and recurring basis and due to the intentional actions and inactions of ADC and its agents, doctors, and employees, Dr. Tahiri was not permitted access to procedure rooms at ADC or other facilities at his previously scheduled times[.]" In addition, he contended, his schedule was made, altered, and managed in such a manner as to create conflicts for him, which thereby forced him to work many more hours than would have otherwise been necessary and than were contemplated when he entered into his employment agreement with ADC. As a result of his denial of access and unauthorized scheduling, Dr. Tahiri alleged, his privileges at the local hospitals were placed at risk, and he was forced to cease providing services in connection with ADC as of May 4, 2005. Dr. Tahiri asserted five counts against ADC: (1) breach of contract; (2) quantum meruit/unjust enrichment; (3) trover/conversion; (4) accounting; and (5) declaratory judgment.

In Dr. Tahiri's request for a declaratory judgment, he asserted that section 12 of his employment agreement was both invalid and unenforceable, due to the fact that Arkansas's adoption of the Uniform Arbitration Act provided that arbitration provisions shall have no application to employer-employee disputes. Dr. Tahiri maintained that such a determination was necessary due to his position that section 17 of the employment agreement, which prohibited his practice of medicine in competition with ADC, was fatally defective and unenforceable.

On March 16, 2006, ADC responded to Dr. Tahiri's complaint and moved to compel arbitration. It further stated a counterclaim, alleging that Dr. Tahiri had failed to remit fifty percent of collections from former ADC patients, which were collected by

Dr. Tahiri during the year following his separation from ADC. In its motion to compel arbitration, ADC asserted that the employment agreement with Dr. Tahiri was subject to the Federal Arbitration Act and, alternatively, to the Arkansas Uniform Arbitration Act. In addition, ADC filed a motion to dismiss Dr. Tahiri's claims for unjust enrichment and conversion.

Dr. Tahiri responded to ADC's counterclaim, generally denying it, and responded to ADC's motion to compel arbitration. In that response, Dr. Tahiri admitted that the majority of his claims arose out of the employment agreement and the remaining claims out of tort; however, he claimed, ADC's motion to compel arbitration should be denied. On April 7, 2006, Dr. Tahiri moved for partial summary judgment, alleging that the employment agreement's covenant not to compete was not arbitrable, as "[a] plain reading of the Employment Agreement shows the Employment Agreement does not evidence 'a transaction involving commerce' . . . ; but instead, is a contract between a local doctor and local employer for medical services to local patients." He asserted that because the employment agreement did not evidence "a transaction involving commerce" as required by 9 U.S.C. § 2 and because the parties had tacitly chosen Arkansas law to govern Dr. Tahiri's provision of services under the agreement, the Federal Arbitration Act did not apply and Arkansas statutes controlled. Nonetheless, he averred, the Arkansas Uniform Arbitration Act provided that the Act should have no application to torts or employer-employee disputes and, for that reason, he claimed, the employment agreement's arbitration provision was inapplicable and summary judgment was proper. Dr. Tahiri further sought summary judgment on his claim for breach of the employment agreement.

ADC responded and moved to stay the case and its response to Dr. Tahiri's motion for partial summary judgment pending a ruling by the circuit court on its motion to compel arbitration. The circuit court granted the stay and set the motion to compel arbitration for a hearing. Following a hearing held May 12, 2006, the circuit court entered its order on May 23, 2006, denying ADC's motion to compel arbitration. ADC now appeals.

ADC argues that the employment agreement at issue involves interstate commerce, thereby subjecting it to the FAA. It submits that at the hearing before the circuit court, it presented

evidence to show that it treated out-of-state patients, received payments from out-of-state insurance carriers, purchased goods from out-of-state vendors, and paid for Dr. Tahiri to travel to seminars outside of Arkansas. ADC avers that where an employer's business activities involve interstate commerce, no matter how slight, Congress has plenary authority to direct the application of the FAA.

Dr. Tahiri responds that ADC failed to introduce uncontroverted facts sufficient to prove that the employment agreement and Dr. Tahiri's actions under that agreement had the requisite nexus with interstate commerce. He contends that his and ADC's practice of medicine under the employment agreement was purely local in nature. He avers that neither the express language of the employment agreement, nor the uncontroverted facts presented at the hearing, evidence "a transaction involving commerce" between any two states or any foreign nation, but instead, contemplate and evidence only transactions wherein a Little Rock doctor performed services for central Arkansas patients through a Little Rock clinic. Finally, Dr. Tahiri asserts that the covenant not to compete in the employment agreement is void as a violation of public policy and, therefore, it is unenforceable and outside the jurisdiction of an arbitrator.

ADC replies that the employment agreement is valid and enforceable and, further, that the parties did not choose Arkansas law. It further maintains that the reach of the Commerce Clause and the application of the FAA is not limited by what the parties contemplated. It urges that the analysis required is not a "minimum-contacts" analysis, but rather one to determine whether the activities of the employer affect or involve interstate commerce. Finally, ADC urges, Dr. Tahiri's request for an advisory opinion on his restrictive-covenant argument should be denied.

An order denying a motion to compel arbitration is an immediately appealable order. *See* Ark. R. App. P. – Civ. 2(a)(12) (2006); *National Cash, Inc. v. Loveless*, 361 Ark. 112, 205 S.W.3d 127 (2005). We review a circuit court's order denying a motion to compel *de novo* on the record. *See National Cash, Inc. v. Loveless, supra.*

At issue in the instant case is whether the arbitration provision contained in the employment agreement between Dr. Tahiri

and ADC is enforceable under the FAA.[2] Title 9 of the United States Code addresses arbitration. Specifically, 9 U.S.C.A. § 2 provides:

> A written provision in any maritime transaction or *a contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C.A. § 2 (1999) (emphasis added). The United States Supreme Court has explained that the purpose of the FAA "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). It "contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." *Volt Info. Scis., Inc. v. Board of Trustees of Leland*, 489 U.S. 468, 477 (1989). "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Id.* at 479. With respect to the FAA and employment contracts, the Supreme Court has explicitly held that employment contracts, except for those covering workers engaged in transportation, are covered by the FAA. *See Equal Employment Opportunity Comm'n v. Waffle House, Inc., supra.*

The term "involving commerce" in the FAA has been interpreted by the Supreme Court as the functional equivalent of the more familiar term "'affecting commerce' — words of art that ordinarily signal the broadest permissible exercise of Congress'

---

[2] While ADC alternatively argued before the circuit court that the arbitration provision at issue was also enforceable under the Arkansas Uniform Arbitration Act, codified at Ark. Code Ann. §§ 16-108-201–224 (Repl. 2006), it appears to have abandoned that argument on appeal. ADC's sole focus and argument, both during the hearing before the circuit court and before this court, was limited to the FAA. Thus, we need only address whether the arbitration provision at issue is indeed enforceable under the FAA.

Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). *See also* William M. Howard, *When Does Contract Evidence Transaction Involving Interstate Commerce Within Meaning of Federal Arbitration Act (FAA) — Legal Issues & Principles*, 10 A.L.R. Fed. 2d 489 (2006) (case review). "Because the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' *Perry v. Thomas*, 482 U.S. 483, 490 (1987), it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce'-that is, 'within the flow of interstate commerce,' *Allied-Bruce Terminix Cos., supra*, at 273 (internal quotation marks, citation, and emphasis omitted)." *Citizens Bank*, 539 U.S. at 56. Whether the transaction alone had a substantial effect on interstate commerce is not solely determinative either:

> Nor is application of the FAA defeated because the individual debt-restructuring transactions, taken alone, did not have a "substantial effect on interstate commerce." 872 So. 2d, at 803. Congress' Commerce Clause power "may be exercised in individual cases without showing any specific effect upon interstate commerce" if in the aggregate the economic activity in question would represent "a general practice . . . subject to federal control." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236 (1948). *See also Perez v. United States*, 402 U.S. 146, 154 (1971); *Wickard v. Filburn*, 317 U.S. 111, 127-128 (1942). Only that general practice need bear on interstate commerce in a substantial way. *Maryland v. Wirtz*, 392 U.S. 183, 196-197, n. 27 (1968); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37-38 (1937).

*Id.* at 56-57. Indeed, the Court has held that the term "involving" is broad and is the functional equivalent of "affecting." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 274 (1995). In addition, the Court has read the FAA's language as "insisting that the 'transaction' in fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Id.* at 281. The party seeking to compel FAA arbitration must show the existence of a written agreement, which contains an arbitration clause and affects interstate commerce. *See Harrison v. Nissan Motor Corp.*, 111 F.3d 343 (3d Cir. 1997).

In the instant case, ADC claims that it has the following interstate connections: the purchase of medical and cleaning supplies from out-of-state vendors, the receipt of payment from out-of-state insurance companies, treatment of three out-of-state

patients, and payment for physician travel to out-of-state conferences. It would appear, based on case law from other jurisdictions, which examined the applicability of the FAA, that such examples involving interstate commerce are insufficient to compel arbitration of the instant matter under the FAA. For example, in *Grohn v. Sisters of Charity Health Services Colorado*, 960 P.2d 722 (Colo. Ct. App. 1998), the Colorado Court of Appeals held that Grohn's employment agreement was a contract involving commerce for purposes of the FAA. The court concluded that Sisters of Charity Health Services' business involved "out-of-state advertising, the treatment of out-of-state patients, receipt of payments from out-of-state insurers, and receipt of goods from vendors located out-of-state" and that Grohn's employment as a clinical coordinator also facilitated his employer's interstate business in that it related to his employer's interstate health-care activities. 960 P.2d at 726.

Similarly, in *Crawford v. West Jersey Health Systems*, 847 F. Supp. 1232 (D.N.J. 1994), the federal district court for the District of New Jersey found that a physician's employment agreement with West Jersey Physician Associates, P.A., also fell within the FAA. That court observed that determining whether the contract at issue evidenced a transaction involving commerce was not a rigorous inquiry, but that the contract "need have only the slightest nexus with interstate commerce." 847 F. Supp. at 1240 (quoting *Maxus, Inc. v. Sciacca*, 598 So. 2d 1376 (Ala. 1992)). Accordingly, based on the evidence presented, the court found that because Dr. Crawford's employment facilitated her employer's interstate business activities, her employment agreement evidenced a transaction involving commerce:

> Defendants WJHS, WJPA, and Newborn Pediatric, treat patients who live and work in Pennsylvania. Affidavit of Michael Stone, Executive Director of West Jersey Medical Services, ¶ 2. Medical costs for many of these patients are paid though out-of-state or multi-state insurance carriers. *Id.* at ¶ 3. Defendants advertise regularly in out-of-state newspapers. *Id.* at ¶ 5. In addition, defendants receive goods and services from numerous out-of-state vendors, including Hartford Life and Accident (Boston, Mass.), Ohio Psychology Publishing, and Weyman Advertising (New York). *Id.*

*Id.*

As already noted, the transaction at issue must turn out, in fact, to have involved interstate commerce. *See Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 553 S.E.2d 110 (2001). "To ascertain

whether a transaction involves commerce within the FAA, the court must examine the agreement, the complaint, and the surrounding facts." *Id.* at 594, 553 S.E.2d at 117. *See also Thornton v. Trident Med. Ctr., L.L.C.,* 357 S.C. 91, 95, 592 S.E.2d 50, 52 (Ct. App. 2003) ("In all cases, determination of whether a transaction involves interstate commerce depends on the facts of the case.").[3] Based on the facts before us, we hold that not only did ADC fail to prove that Dr. Tahiri's employment facilitated its interstate business activities, it failed to prove that it engaged in interstate business activities. *See, e.g., Crawford v. West Jersey Health Sys., supra.* Here, ADC presented its exhibit outlining what it considered its interstate ties:

| | | | | |
|---|---|---|---|---|
| Out of state Vendors | = | McKesson | = | supplies |
| | | Quest | = | lab |
| | | CureScript | = | medication |
| | | Olympus | = | scopes |
| | | Ruehart | = | cleaning agents for scopes |
| Out of state insurances | = | Acordia | = | Charleston, West Virginia |
| | | Aetna | = | Greensboror [sic], North Carolina |
| | | Cigna | = | Sherman, Texas |
| | | CMS | = | St. Louis, Missouri |
| | | Epoch Group | = | Clayton, Missouri |
| | | Embassy of United Arab | = | Washington, D.C. |
| | | United HCare | = | Atlanta, GA |

---

[3] Interestingly, the *Thornton* case held that a physician's performance of a recruitment agreement with a medical center "require[d] activity involving interstate commerce." 357 S.C. at 97, 592 S.E.2d at 53. The court noted that, contrary to Thornton's assertions, "the subject matter of the contract clearly extend[ed] beyond Thornton's obligation to provide medical services in South Carolina." *Id.,* 592 S.E.2d at 53. The court observed that an essential requirement for performance under the agreement was Thornton's relocation from Michigan to South Carolina within a fixed period of time. It then noted that the contract "was denominated as and was intended as a recruiting agreement to induce Thornton's move across state lines." *Id.* at 98, 592 S.E.2d at 53. We note that, here, it is only an employment agreement at issue, which obligates Dr. Tahiri to provide medical services, and not a recruitment agreement.

| Out of state patients = | Adams | = | Spokane, Washington |
|---|---|---|---|
| | Hamilton | = | Garland, Texas |
| | Patton | = | Dallas, Texas |

Expenses ADC paid for CME Credits/Seminars:

American Gastroenterology Association

7/2/04 – 7/9/04 = Two Harbors, MN

at the Superior Shores Resort

A review of the exhibit demonstrates that ADC did have interstate ties, just like many other corporations, in that it purchased goods from out of state and received payments from out-of-state insurance companies; however, ADC failed to provide proof that it engaged in interstate business activities. For instance, Marion York, the office administrator at ADC, testified that ADC had only three out-of-state patients and, to her knowledge, ADC had never advertised in any out-of-state publication on a regular basis to attract clients. Moreover, ADC failed to put on any proof of any outward attempt by ADC to obtain patients from out of state or any effort by ADC to promote the clinic's reputation outside of Arkansas, as was the case in both *Grohn* and *Crawford*. Nothing presented by ADC demonstrated that it considered itself, or operated as, an interstate business. Instead, the evidence ADC did present failed to demonstrate anything other than that it was a local clinic, with local physicians who had privileges at local hospitals, and treated local patients.[4]

 Most importantly, not only did ADC fail to prove it had interstate business activities, it also failed to prove that Dr. Tahiri's employment facilitated its alleged interstate business activities. A review of the employment agreement reveals that Dr. Tahiri contracted with ADC to provide medical services, not to purchase interstate goods, nor to receive payment from out-of-state insurance companies. No testimony was presented as to how much, if any, of the out-of-state supplies purchased by ADC were used by Dr. Tahiri. Nor was any evidence presented as to whether Dr. Tahiri was required to attend *out-of-state* conferences to continue his medical education. Most specific to the employment contract at issue is that ADC was a *local* clinic, which contracted

---

[4] Of course, this excepts the three out-of-state patients claimed by ADC. Indeed, Ms. York's testimony conflicted as to whether Dr. Tahiri even treated any of the three patients.

with Dr. Tahiri to provide medical services to its *local* patients. Based on these factors, we hold that Dr. Tahiri's employment agreement did not facilitate ADC's alleged interstate business activities and did not evidence a transaction involving commerce. *See, e.g., Lehman Props., Ltd. P'ship v. BB & B Constr. Co., Inc.,* 81 Ark. App. 104, 98 S.W.3d 470 (2003) (holding that where the appellee purchased construction supplies locally, where all of the parties were situated in Arkansas, where the work was done in Arkansas, and where the contract itself to construct a subdivision did not evidence a transaction involving interstate commerce, the circuit court was correct in finding that the FAA did not apply).

■ Were this court to hold otherwise, it would equate to a finding that the FAA is applicable to any contract containing an arbitration clause, as it could be argued that every contract involves some nexus to interstate commerce, i.e., use of interstate telephone lines or of interstate mail. We do not interpret the jurisprudence concerning the FAA to include any and every contract. *See, e.g., Volt Info. Scis., Inc. v. Board of Trustees of Leland, supra* (observing that the FAA contains no express preemptive provision). Instead, the question is simply whether the *contract* evidences a *transaction* involving commerce. And further, as already stated, it is the burden of the party seeking to compel arbitration to prove that the contract at issue involves commerce. *See, e.g., Potts v. Baptist Health Sys., Inc.,* 853 So. 2d 194, 199 (Ala. 2002) ("The burden of proof was on the defendants to provide evidence demonstrating that Potts's employment contract, or the transaction it evidenced, substantially affected interstate commerce."). Because we do not consider Dr. Tahiri's employment with ADC a transaction involving commerce and because ADC failed to meet its burden of demonstrating that the contract evidenced a transaction involving commerce, we hold that the matter does not fall within the ambit of the FAA. Thus, we affirm the circuit court's denial of the motion to compel arbitration.[5]

---

[5] We note that it appears that the circuit court, in making its decision, relied more on the contemplation of the parties, rather than whether the transaction itself involved commerce. *See Allied-Bruce Terminix Cos., Inc. v. Dobson, supra.* That, however, is of no moment, as we can affirm because the circuit court reached the right result, albeit for the wrong reason. *See Sluder v. Steak & Ale of Little Rock, Inc.,* 368 Ark. 293, 245 S.W.3d 115 (2006).

■ With respect to Dr. Tahiri's argument regarding the validity and enforceability of the covenant not to compete included within the employment agreement, that issue has yet to be ruled upon by the circuit court. A review of the record reveals that Dr. Tahiri raised that argument to the circuit court in his motion for partial summary judgment. However, the circuit court, in its order of May 2, 2006, stayed the case, including the motion for partial summary judgment. Therefore, that issue has not yet been decided and any discussion or analysis by this court at this juncture would be premature. Indeed, any decision by this court would constitute an advisory opinion, which this court will not issue. *See, e.g., Kinchen v. Wilkins,* 367 Ark. 71, 238 S.W.3d 94 (2006).

As a final matter, we note that in his brief, by way of a statement of costs and certificate of counsel, Dr. Tahiri requests costs in the amount of $600 for the preparation of his supplemental abstract and statement of the case. Specifically, counsel for Dr. Tahiri submits that he spent 1.9 hours, at $150 per hour, preparing a supplemental abstract and 2.1 hours, at $150 per hour, preparing a supplemental statement of the case.

■ Our court rules provide that if an appellee considers an appellant's abstract or addendum defective, the appellee's brief should call the deficiencies to the court's attention and may, at the appellee's option, contain a supplemental abstract or addendum. *See* Ark. Sup. Ct. R. 4-2(b)(1) (2006). When the case is considered on the merits, this court may, upon motion, impose or withhold costs, including attorney fees, to compensate either party for the other party's noncompliance with the rule. *See id.* In seeking an award of costs under Rule 4-2(b)(1), counsel must submit a statement showing the cost of the supplemental abstract or addendum and a certificate of counsel showing the amount of time that was devoted to the preparation of the supplement abstract or addendum. *See id.* In this case, we find that Dr. Tahiri's supplemental abstract alone, which contained more of Ms. York's testimony than did ADC's abstract, was necessary to our determination of the case. Therefore, we award Dr. Tahiri costs in the amount of $285.

Affirmed.

BROWN and IMBER, JJ., concur.

R OBERT BROWN, Justice, concurring. It is unclear to me whether the employment agreement executed between

ADC (the Clinic) and Dr. Tahiri qualifies as a "contract evidencing a transaction involving commerce" such as to render the Federal Arbitration Act (FAA) applicable. 9 U.S.C. § 2 (1999). Nevertheless, I concur in the majority's result that the FAA should not apply in this case.

As the majority opinion correctly points out, the United States Supreme Court has interpreted the terms "involving commerce" broadly as to signify Congress's intent to exercise its power under the Commerce Clause to its fullest. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265 (1995). Moreover, there is no question but that the FAA covers more than "only persons or activities *within the flow* of interstate commerce." *Id.* at 273. Indeed, for a contract to evidence a transaction involving commerce, it "need have only the slightest nexus with interstate commerce." *Crawford v. West Jersey Health Systems*, 847 F. Supp. 1232, 1240 (1994). Furthermore, the FAA may apply to a transaction even if that transaction, taken alone, does not have a " 'specific effect on interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal control.' " *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003) (quoting *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).

The majority opinion states that though the Clinic demonstrated that it had interstate ties, it failed to prove that it engaged in interstate business activities. The Clinic, however, presented evidence that cleaning and medical supplies were purchased from out-of-state vendors, that three out-of-state patients were treated in the Clinic, and that payments were received on behalf of patients from out-of-state insurance carriers. The Clinic, without question, could not treat patients without medical supplies and without receiving payments for the treatment.

The purchase of out-of-state supplies, treatment of out-of-state patients, and receipt of payments from out-of-state insurance companies have been factors considered by other jurisdictions in deciding this issue. *See Eddings v. Southern Orthopaedic & Musculoskeletal Associates*, 605 S.E.2d 680 (N.C. App. 2004) (physician's contract with employer involved interstate commerce where physician moved from one state to another to accept employment with employer, and employer treated patients who lived out-of-state, received payments from out-of-state insurance carriers, and ordered goods and services from out-of-state vendors); *Potts v. Baptist Health System, Inc.*, 853 So. 2d 194 (Ala. 2002) (nurse's employ-

ment contract with hospital had a substantial effect on interstate commerce where hospital treated out-of-state patients, recruited physicians from out-of-state, and in doing so used telephones, U.S. mail, and air transportation, received a large amount of payments from out-of-state insurance carriers, and received supplies from out-of-state vendors, which nurse used daily in treating patients); *In re Tenet Healthcare, LTD*, 84 S.W.3d 760 (Tex. App. 2002) (employment contract between distribution clerk and hospital related to interstate commerce where the hospital treated out-of-state patients, ordered goods and services from out-of-state suppliers, and received payments from out-of-state insurance carriers as well as federal funds from Medicaid and Medicare, and employment contract specified that the FAA should govern the arbitration agreement); *Crawford, supra* (physician's employment contract with hospital evidenced a transaction involving commerce where hospital treated patients from out-of-state, received payments from out-of-state insurance carriers, advertised regularly in out-of-state newspapers, and ordered goods from out-of-state vendors).

Though the above-cited cases generally involved at least one tie to interstate commerce in addition to those present in the instant case, the United States Supreme Court has not required a minimum number of interstate ties, but rather, as already discussed, has interpreted the impact of the FAA broadly based on Congress's power under the Commerce Clause. *See Allied-Bruce Terminix, Cos., supra.* Still, I could find no case applying the FAA simply based on the factors involved in the case at hand, and the United States Supreme Court has given no direction as to the standard to be applied in these cases, other than its reference to a "general practice," which is subject to federal control. *Citizens Bank v. Alafabco, Inc.*, 539 U.S. at 57. Rather, courts such as ours appear to be relegated to a case-by-case analysis, which amounts to a weighing of the factors in each individual case. What the Court has made clear is that Congress has not completely preempted this area with the FAA. *Volt Info. Scis., Inc. v. Board of Trustees of Leland*, 489 U.S. 468 (1989).

The dilemma for me in this case is that Dr. Tahiri's employment agreement helped facilitate the Clinic's interstate ties. The Clinic is in the business of providing medical services to patients, and it cannot do this without physicians on staff. If it were not for its employed physicians, such as Dr. Tahiri, the Clinic would have no reason to purchase cleaning and medical supplies from out of state, would have absolutely no contact with foreign insurance

carriers, and would not be treating out-of-state patients. If it were not for Dr. Tahiri's, as well as other physicians' employment agreements, the Clinic would not have been involved in interstate commerce at all.

By the same token, I understand the majority's concern over federal preemption. It is difficult to fathom a medical business of any size that would not buy pharmaceutical supplies from out of state or receive insurance payments from non-resident carriers. The fact that the Clinic provided services to three out-of-state patients is an important consideration but clearly the Clinic did not make a strong case for a general interstate practice based on this minimal number. In sum, I conclude that because of the circumstances in this case, a decision in favor of the FAA's application would virtually equate to federal preemption. For that reason, I concur in the result.

IMBER, J., joins this concurrence.